No. 03-2523C
Judge Williams

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

BRUCE RUTTENBURG,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

---

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

---

JAMES GEAGAN
Law Offices of James Geagan
846 Broadway
Sonoma, California 95476

Tel: (707) 939-9593

Attorney for Plaintiff

April 28, 2004

TABLE OF CONTENTS


Table of Authorities . . . . . . . . . . ii

Statutes . . . . . . . . . . iii

Other Authorities . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . 1

STATEMENT OF CASE . . . . . . . . . . 1

I. Nature of the Case . . . . . . . . . . 1

II. Summary of Facts . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 6

I. Applicable Law . . . . . . . . . . 6

II. Plaintiff Has Alleged A Cognizable Claim For Breach of Contract Against The United States . . . . . . . . . . 7

A. Plaintiff Has Pleaded the Elements of An Implied In Fact Contract . . . . . . . . 7

B. The Law Does Not Require That An Implied In Fact Contract Be In Writing In Order to be Enforceable . . . . . . . . . . 8

C. The Fact That A Purported Subsequent Contact Between The Parties Was Executed Does Not Defeat The Claim . . . . . . . . . . 9

D. The United States Has Not Demonstrated That Carla Mendoza's Conduct Could Not Bind The United States . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . 12

TABLE OF AUTHORITIES

**Cases**

Aero Abre, Inc. v. United States (1997) 39 Fed. Cl. 654, 657 . . . . . . . . . . . . . . . . . . . . 11

Algonac Mfg. Co. v. United States (1970) 428 F.2d 1241; 192 Ct. Cl. 699 . . . . . . . . . . . 7

City of El Centro v. United States (Fed. Cir. 1990) 922 F.2d 816 . . . . . . . . . . . . . . . . . . 7

Coastal Petroleum Co. v. United States (1979) 220 Ct.Cl. 690, 693 . . . . . . . . . . . . . . . . . 6

Conley v. Gibson (1957) 355 U.S. 41, 45-46; 78 Sup.Ct. 90, 101-102; 2 L.Ed. 2d 80 . . . . 6

Dolmatch Group, Ltd. v. United States (1998) 40 Fed.Cl. 431, 438 . . . . . . . . . . . . . . . 11

Hamlet v. United States (Fed. Cir. 1989) 873 F2d. 1414, 1416 . . . . . . . . . . . . . . . . . . . . 6

Heckler v. Community Health Services,
(1984) 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed. 2d 42 . . . . . . . . . . . . . . . . . . . . . . . . 12

Housing Corp. of America v. United States
(1972) 199 Ct.Cl. 705, 710; 468 F2d 922, 92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H. Landau & Co. v. United States (Fed. Cir. 1989) 886 F.2d 322 . . . . . . . . . . . . . . 10, 11

Janowsky v. United States (Fed. Cir. 1998) 133 F3d 888 . . . . . . . . . . . . . . . . . . . . . . 11

Narva Harris Construction Comp. v. United States
(1978) 216 Ct. Cl. 2138, 574 F.2d 508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Pacord, Inc. v. Untied States (1998 9th Cir.) 139 F3d 1320 . . . . . . . . . . . . . . . . . . . . . . . . . 8

Silverman v. United States (1982) 230 Ct.Cl. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . 11

South Louisiana Grain Services, Inc. v. United States (1982) 1 Cl.Ct. 281, 289 . . . . . . . . 7

Technograph Printed Circuits, Ltd. v. United States
(1967) 178 Ct.Cl. 543, 560; 372 F.2d 969, 980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Trauma Service Group v. United States (Fed. Cir. 1997) 104 F.3d 1321, 1326 . . . . . . . . . 9

**Statutes**

28 USC §1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
25 U.S.C. §1616(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
25 U.S.C. §1616(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
U.S.C. §2000(c)(1)(1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Other Authorities**

RCFC Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
RCFC Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12
Restatement of Contracts 2d §176 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BRUCE RUTTENBURG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2523C |
| v. | ) | |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff opposes Defendant's Motion to Dismiss and alternative Motion for Summary Judgment. The Complaint which those motions attack raises cognizable claims against the United States. Further, to the extent the motion is considered as one for Summary Judgment, there are clearly unresolved and disputed facts which require denial of the motion.

Plaintiff submits his affidavit in opposition to the motion in the event the Court considers Defendant's motion as one for Summary Judgment.

## STATEMENT OF THE CASE

### I. Nature of The Case

This is an action for breach of contract brought by Bruce Ruttenburg against the United States. Jurisdiction is based upon 28 USC §1491. Mr. Ruttenburg accepted an offer from the Indian Health Service Loan Repayment Program in 1999 to the effect that he would receive a $30,000 per year reduction in his outstanding student loans plus a 31% payment of

his additional federal income taxes if he took a position with the Maniilaq Association in Kotzebue Alaska as a licensed psychologist. After Mr. Ruttenburg closed his practice, vacated his home, moved to Kotzebue, Alaska and became employed by Maniilaq, the government purported to change the terms of the agreement, reducing the benefit to $20,000 per year loan paydown and a 20% payment of taxes.

Mr. Ruttenburg alleges that the United States breached the agreement of 1999 in that Mr. Ruttenburg has never received the loan paydown and tax benefits agreed to. He alleges losses to date of $61,200 plus interest.

## II. Summary of Facts

In 1999, plaintiff Bruce Ruttenburg was a licensed psychologist practicing in the State of California, where he had lived for many years. He was operating his own practice in Santa Rosa, California [Complaint ¶¶ 2, 7; Affidavit of Bruce Ruttenburg (hereinafter "Ruttenburg Declaration") ¶2].

Mr. Ruttenburg's graduate education had been substantially financed by student loans, which totaled over $80,000 by the time of his graduation. In order to carry out his responsibility to repay these student loans, he became interested in the Indian Health Services Loan Repayment Program (hereinafter "IHSLRP"). That program in 1999 offered health care professionals $30,000 per year in loan repayment plus a 31% annual payment of additional federal income taxes if they accepted employment at sites deemed to be in need of their services by the Indian Health Services. Relying on this benefit, Mr. Ruttenburg applied for the program on October 8, 1997. (Complaint ¶3; Ruttenburg Affidavit ¶4). The paperwork required to comprise a completed application was an application of four pages, a signed

contract of four pages and a signed affidavit of four pages. Mr. Ruttenburg signed all of these documents. [Appendix to Defendant's The [sic] Motion to Dismiss or, In the Alternative For Summary Judgment (hereinafter "Appendix") pp. 12]. The four page contract signed by Mr. Ruttenburg on that date provided for the $30,000/31% benefit.

When Mr. Ruttenburg was not offered employment which would qualify him for participation in the IHSLRP program for 1998, he asked that his application be kept active. He executed no further application papers. During the year 1998, the advertised benefit for perspective participants in the Program remained $30,000/31%. (Ruttenburg Declaration ¶4)

In March 1999, Mr. Ruttenburg was offered a position with Maniilaq Association in Kotzebue, Alaska. Mr. Ruttenburg contacted Carla Mendoza of the IHSLRP as he contemplated accepting the offer. Ms. Mendoza was the designated specialist dealing with mental health provider applicants and Mr. Ruttenburg's sole contact person for the Program. At the time of the conversation with Ms. Mendoza, the benefit being offered was the $30,000/31% benefit. Ms. Mendoza advised that if Mr. Ruttenburg accepted the Maniilaq position, he would not qualify to receive benefits in 1999 as they had all been allocated for that year. However, she indicated that he would be eligible for participation for the year 2000 on the same terms. Ms. Mendoza advised that if Mr. Ruttenburg accepted the position with Maniilaq, he would be approved for participation with IHSLRP for the year 2000 at the agreed rate if two conditions occurred: the Maniilaq site was deemed an approved site by IHSLRP and Congress re-appropriated the funds for the fiscal year in question. Ms. Mendoza advised that she could not guarantee that those conditions would occur, but also advised that Maniilaq had been deemed a high-need site and had qualified for the Program for the last ten years or so.

Ms. Mendoza did not state that the annual benefit was subject to change. Based upon the representation of Ms. Mendoza, Mr. Ruttenburg accepted the position with Maniilaq in April 1999. (Complaint ¶¶ 5, 7; Ruttenburg Declaration ¶5)

Mr. Ruttenburg immediately began preparations to move from California to Alaska. He closed his practice, moved from his home and relocated to Kotzebue, north of the Arctic Circle. He was on duty at Maniilaq on the appointed date of July 1, 1999. (Complaint ¶¶ 7, 9; Ruttenburg Declaration ¶6)

Congress did fund the IHSLRP for 2000 and Maniilaq was certified as a qualified site. (Complaint ¶8). Thus, the two necessary conditions for Mr. Ruttenburg's contract with IHSLRP occurred.

In August 1999, while working at Maniilaq, Mr. Ruttenburg was orally informed the IHSLRP had decided to change the level of benefits for IHSLRP participants for the year 2000 and that he would only receive a $20,000 per year loan repayment plus 20% of the additional taxes. (Complaint ¶10; Ruttenburg Declaration ¶7). Mr. Ruttenburg protested to many officials of IHS this unilateral change in the terms of the contract. He emphasized that the Program required a participant to be already working at a qualified site on the first day of the year of participation and thus a unilateral change in benefit after the participant had already begun working at a site was patently unfair. (Complaint ¶10). He received no response to these protests except the recognition that he was in a unique position. (Ruttenburg Declaration ¶8)

Mr. Ruttenburg was presented with a form of contract in early 2000 on a "take it or leave it" basis. It provided for a reimbursement amount of $20,000/20%. Recognizing that he

had no bargaining power, that he had a loan to pay, and that he was already in Alaska working at Maniilaq, he signed the document. (Ruttenburg Declaration ¶9)

Prior to signing the document, Mr. Ruttenburg directed legal counsel to write to the IHSLRP pointing out the contract violation and proposing a resolution in which the Government would honor its contract for $30,000/31%. No written responses was received, but in the year 2000, Mr. Ruttenburg received reimbursements in that amount, justifiably concluding that the IHSLRP had reaffirmed its contract and that the matter was closed. (Ruttenburg Declaration ¶10; Complaint ¶13)

Following receipt of the 2000 benefit, Mr. Ruttenburg was advised in early 2001 that the program had made a mistake in paying him at the $30,000/31% rate and that the "overpayment" would be deducted from the 2001 benefit. That is what occurred (Complaint ¶14; Ruttenburg Declaration ¶11)

Mr. Ruttenburg has signed two forms of contract extending his participation in the program for one year each. Each purported contract provided for the $20,000/20% benefit. Each was signed against the continuing backdrop of Mr. Ruttenburg's clear objection that they were not consistent with the agreement he had with the Government in 1999 and on a "take it or leave it" basis. The IHSLRP has a policy that extensions to contracts will be at the benefit rate expressed in the original contract. (Complaint ¶19; Ruttenburg Declaration ¶12)

Mr. Ruttenburg had been deprived of $61,200 through December 2003 by virtue of the attempt of the IHSLRP to unilaterally change the terms of the 1999 benefit. Those damages are continuing. (Complaint ¶22)

## ARGUMENT

### I. Applicable Law

In evaluating a motion to dismiss pursuant to RCFC 12(b), the Court must construe all unchallenged allegations in the Complaint in favor of the pleader. Hamlet v. United States (Fed. Cir. 1989) 873 F2d. 1414, 1416. Further, a court may not dismiss the action unless the plaintiff can prove no set of facts which entitle him to relief. Conley v. Gibson (1957) 355 U.S. 41, 45-46; 78 Sup.Ct. 90, 101-102; 2 L.Ed. 2d 80.

In the event the Court considers defendant's motion as one for Summary Judgment pursuant to Rule 56, the Court must find no genuine issue as to any material fact in order to grant such a motion. Technograph Printed Circuits, Ltd. v. United States (1967) 178 Ct.Cl. 543, 560; 372 F.2d 969, 980. For purposes of ruling on such a motion, all doubts relative to material facts in issue must be resolved against the moving party. Housing Corp. of America v. United States (1972) 199 Ct.Cl. 705, 710; 468 F2d 922, 924. When the evidence presented to the Court on Summary Judgment offers a choice of inferences to be drawn from the underlying facts, the inferences must be viewed in the light most favorable to the party opposing the motion. Coastal Petroleum Co. v. United States (1979) 220 Ct.Cl. 690, 693.

As set forth below, plaintiff has clearly pleaded a cognizable claim for breach of contract. Further, there are multiple issues of material fact which remain unresolved and unaddressed by defendant's motion.

## II. Plaintiff Has Alleged A Cognizable Claim For Breach of Contract Against The United States

### A. Plaintiff Has Pleaded the Elements of An Implied in Fact Contract

It has long been held that this Court has jurisdiction over implied-in-fact contracts with the Federal Government. Algonac Mfg. Co. v. United States (1970) 428 F.2d 1241; 192 Ct. Cl. 699.

The elements of an implied-in-fact contract have also been long established. The party alleging a contract must show a mutual intent to contract including an offer, an acceptance and consideration. City of El Centro v. United States (Fed. Cir. 1990) 922 F.2d 816.

The central element of such a contract is whether a “meeting of the minds” occurred such that the non–written agreement is enforceable. c.f. South Louisiana Grain Services, Inc. v. United States (1982) 1 Cl.Ct. 281, 289.

Plaintiff has alleged the elements of an implied-in-fact contract. The offer and acceptance occurred when Mr. Ruttenburg’s application, written in 1997, was accepted by Carla Mendoza in the conversation of April 1999. The terms were agreed upon as were the conditions which would have to come to pass for the agreement to be in force. There was clearly a meeting of the minds as to the acceptance of Mr. Ruttenburg’s application. The existence of the agreement was corroborated by Mr. Ruttenburg’s acceptance of the Maniilaq offer, his closing down his practice, and his change of residence to Kotzebue, Alaska. There is no claim by the Government that there was any benefit ever offered to Mr. Ruttenburg other than the $30,000/31% benefit prior to his beginning his duties at Maniilaq.

**B. The Law Does Not Require That An Implied In Fact Contract Be In Writing In Order to be Enforceable**

The Government argues that Mr. Ruttenburg's contract with IHSLRP cannot be enforced because it is not in writing. Defendant cites 25 U.S.C. §1616(a) for this proposition. That statute makes reference to a written contract as the basis of the agreement by which an applicant becomes a participant in the program.

The Courts have had an opportunity to address the issue of whether statutory requirements that contracts be in writing operate to defeat claims of implied-in-fact contracts. In Pacord, Inc. v. Untied States (1998 9th Cir.) 139 F3d 1320, the plaintiff was a subcontractor who alleged that it had an implied-in-fact contract with the Government for payment for its services. The Government asserted that the claim should be dismissed because the general contractor, not the plaintiff, had a written contract with the Government and because the Federal Acquisition Regulation required that contracts be in writing. The Ninth Circuit, in reversing a grant of Summary Judgment in favor of the Government, stated that if the plaintiff could establish sufficient facts beyond a mere oral contract for there to be an inference of the existence of an implied-in-fact contract the absence of a written contract would not defeat the claim. The Ninth Circuit cited the Court of Claims opinion in Narva Harris Construction Comp. v. United States (1978) 216 Ct. Cl. 2138, 574 F.2d 508 as persuasive authority on this issue. Narva Harris involved the provisions of U.S.C. §2000(c)(1)(1970) which required that certain Government contracts be in writing. The Court held that the absence of a written contract did not defeat the claim, observing that an acceptance of the Government's position would result in the elimination of virtually all claims alleging implied-

in-fact contracts since almost all of them are based on some sort of oral representation by a government agent. Narva Harris, supra at 243-244; 574 F.2d at 511.

In the case at bar, there are multiple factors aside from the oral assertions of Carla Mendoza which lead to an inference of implied-in-fact contract, including the execution by Mr. Ruttenburg of the form contract in 1997, the publication by the Government of the $30,000/31% at all times prior to Mr. Ruttenburg's accepting the Maniilaq position, Mr. Ruttenburg's substantial change in position in reliance on the contract and the actual payment by the Government of the agreed-upon benefit ($30,000/31%) for the first year (later termed an "overpayment"). The absence of a writing evidencing the contract at issue does not defeat Mr. Ruttenburg's claim for breach of an implied-in-fact contract.

**C. The Fact That A Purported Subsequent Contract Between The Parties Was Executed Does Not Defeat The Claim**

The United States asserts that because there was a written contract covering the same subject matter, the implied-in-fact contract cannot be enforced. The Government, perhaps acknowledging the weakness of this argument, relegates it to a footnote. (See Defendant's Motion to Dismiss etc.fn.4). But what the cases cited by the defendant stand for is the proposition that there generally cannot be such an implied contract if there is an "...express contract [which] already covers the same subject matter." Trauma Service Group v. United States (Fed. Cir. 1997) 104 F.3d 1321, 1326 (emphasis added). In the case at bar there was no written contract in existence at the time the implied-in-fact contract was formed. Any writings purporting to be contracts were executed later. Thus, the defendant's argument is without merit.

Further, it must be pointed out that the purported written contracts between Mr. Ruttenburg and IHSLRP are in the nature of adhesion contracts. They were drafted by defendant, presented on a "take-it-or-leave-it" basis, and executed at a time when there was grossly unequal bargaining power between the parties.

The Complaint alleges a notable absence of a "meeting of the minds" with respect to the contracts presented to Mr. Ruttenburg for his signature after his moving to Alaska and commencing his duties at Maniilaq. It is alleged that Mr. Ruttenburg signed the contracts because he felt he had no viable alternative. There was no true acceptance despite Mr. Ruttenburg's signature on the documents. The concept of economic compulsion (Restatement of Contracts 2d §176) would operate to void any apparent acceptance. It should also be noted that Mr. Ruttenburg's signature on the contracts and his subsequent receipt of the reduced benefits operated to mitigate his damages, a duty the law imposes on him.

**D. The United States Has Not Demonstrated That Carla Mendoza's Conduct Could Not Bind The United States**

Defendant seems to argue that Carla Mendoza did not have the actual authority to enter into an implied-in-fact contract with Mr. Ruttenburg on behalf of IHS. However, the Government provides no evidence to support this inferential argument. Thus, the Government has not met its burden either on Summary Judgment or Motion to Dismiss on the issue that she lacked authority to bind the Government. Whether she had such authority or not is at the present an unresolved question of fact justifying denial of defendant's motion.

Other issues regarding Ms. Mendoza's conduct and its power to bind the Government are similarly in dispute. Even if Ms. Mendoza did not have actual authority to contract, the

issue of "implied actual contracting authority". [c.f. H. Landau & Co. v. United States (Fed. Cir. 1989) 886 F.2d 322)] would remain unresolved. Pursuant to that concept, the actual authority of governmental official is implied when such authority is "considered to be an integral part of the duties assigned" to that official. H. Landau, supra at 324.

Similarly, the question of the Government's ratification of Ms. Mendoza's conduct and the implied-in-fact contract remains in dispute. "Ratification occurs when a ratifying official has actual or constructive knowledge of an authorized agreement, and expressly or impliedly adopts the agreement. "Aero Abre, Inc. v. United States (1997) 39 Fed. Cl. 654, 657. See also Dolmatch Group, Ltd. v. United States (1998) 40 Fed.Cl. 431, 438. The initial payment by the United States of the full benefit agreed to in the implied-in-fact contract ($30,000/31%) raises at the very least a question as to Government ratification of that contract.

"Institutional ratification" is similarly an unresolved issue justifying denial of defendant's motion. An agency can be found to have ratified an unauthorized contract even in the absence of specific ratification by an authorized official. Such ratification occurs when the Government seeks and receives the benefits from an otherwise unauthorized contract. Janowsky v. United States (Fed. Cir. 1998) 133 F3d 888; Silverman v. United States (1982) 230 Ct.Cl. 701. The purpose of the IHSLRP is to provide an adequate supply of trained health care professionals necessary to provide health care services to Indians. 25 U.S.C. §1616(a)(1). The Complaint alleges that the Government accepted the benefits of Mr. Ruttenburg's services in Indian health care and even paid him at the agreed rate of benefit ($30,000/31%) for over a year before declaring an "overpayment" and docking his benefits for 2001. A triable question of institutional ratification clearly exists.

The authority of Carla Mendoza is also relevant to the related question of whether the Government should be estopped to deny the existence of the contract. A party claiming estoppel must have relied upon the conduct of the adverse party in a manner such as to change his position for the worse and such reliance must have been reasonable in that the party claiming the estoppel did not know that the adversay's conduct was not accurate. Heckler v. Community Health Services, (1984) 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed. 2d 42. Clearly, there is adequate pleading of substantial reasonable detrimental reliance on the part of Mr. Ruttenburg sufficient to raise an issue of governmental equitable estoppel.

**CONCLUSION**

The Complaint in this action clearly states a cognizable cause of action for breach of contract over which this Court has jurisdiction. Thus, the Government's Motion to Dismiss pursuant to RCFC Rule 12(b)(6) must be denied. In the event that the Court treats defendant's motion as one made pursuant to RCFC Rule 56 for Summary Judgment, that motion must be denied as there exist triable issues of fact as to the elements of plaintiff's breach of contract claims.

In the event the Court finds any merit at all to defendant's motions, plaintiff seeks leave of Court to amend his Complaint to cure any defects which may exist.

Dated: April 28, 2004

Respectfully submitted,

s/James Geagan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BRUCE RUTTENBURG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-2523C |
| v. | ) | |
| | ) | (Judge Williams) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT OF BRUCE RUTTENBURG IN OPPOSITION TO MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiff Bruce Ruttenburg declares under penalty of perjury that the following is true and correct:

1. I am a licensed psychologist employed by the Maniilaq Association in Kotzebue, Alaska.

2. Prior to my employment with Maniilaq Association, I had been a licensed psychologist in the State of California and had operated a private practice of psychology in Santa Rosa, California for four years. I had been living in the Santa Rosa, California area for many years and considered it my home.

3. My graduate education qualifying me to become licensed as a psychologist was substantially financed by student loans. By the time of my graduation, I had over $80,000 of student loans outstanding. Because it appeared that repaying these loans would take a substantial period time, I became interested in the Indian Health Service Loan Repayment Program. This program provided for a repayment of certain student loans if the healthcare

///

professional agreed to and became employed at a qualified site approved by the Indian Health Service. At the time I became aware of the Program, the benefit described was $30,000 per year in loan paydown plus an annual payment of 31% of the additional federal income taxes incurred because of the paydown.

4. I applied for the IHSLRP on October 8, 1997 by filling out an application form and signing a form of contract. The contract form provided for a $30,000/31% annual benefit. When I did not secure a job with the qualified site, I requested in writing to Carla Mendoza of the Indian Health Service that my IHSLRP application be rolled over and considered for the following fiscal year, which would be 1999. I did not submit any further application forms. In 1998, the loan repayment amounts stated in all of the public notifications about the program were $30,000 per year plus 31% of the additional federal income tax liability for participating healthcare providers in the program. The form of contract I had signed on October 8, 1997 provided for these benefits.

5. In March 1999 I was offered a position as a staff psychologist with Maniilaq Association in Kotzebue, Alaska, to begin July 1999. While I was considering the offer by the Maniilaq Association, I had a telephone conversation with Ms. Mendoza in April 1999. Ms. Mendoza was identified as the specialist dealing with mental health provider applicants for IHSLRP and was the sole contact person for my participation in the Program. She advised that the loan repayment program of $30,000/31% would not be available to me for fiscal year 1999 even if I accepted the position at Maniilaq Association and began working there in 1999 because all of the available funds had been exhausted. I advised her that if I were to accept the Maniilaq position, I would have to begin working there on July 1, 1999. She and I had a discussion of the prospects for my receiving approval to participate in the program if I did

accept the job at Maniilaq. Ms. Mendoza explained that Congress allocated the funds for the program on an annual basis, usually around November. She also explained that the IHS sites were rated for loan repayment by professional discipline and on an annual basis and that eligible applicants were awarded loan repayment based on the priority number assigned to their site by the IHS and the amount of funds that were made available by Congress. She advised that if I moved to Alaska and took the job with Maniilaq, I would be approved for loan repayment provided two conditions occurred: first, that the Maniilaq Association would be deemed to be a qualified site by the IHS and second, that Congress re-funded the program. She advised that if these two conditions were met, the Indian Health Service would sign the contract which I had already signed ( for $30,000/31%) and I would begin to receive the loan repayment proceeds as indicated in the contract. Ms. Mendoza indicated that she could certainly not guarantee that the Maniilaq site would be approved for fiscal year 2000, but upon my direct questioning she did advise that that entity was in a very high need area and that providers there had been consistently awarded loan repayment for at least the most recent 10 year period. She indicated she knew of no reason why Congress would not allocate funding for fiscal year 2000. I was never advised of any risk that the repayment benefit could be changed by the department unilaterally. I advised Ms. Mendoza that, given that set of circumstances, I would accept the position at Maniilaq. At all times during our discussion, the benefit discussed was the $30,000/31% benefit.

6. In April 1999, I moved out of my home in California, closed down my private practice and made all the other arrangements for a move to Kotzebue Alaska. I made this decision based upon the representations from Ms. Mendoza that I would become a participant in the loan repayment program for 2000 at the rate of $30,000/31% per year if the Maniilaq

site were approved and if Congress appropriated funds for the program. With accrued interest, my student loan debt was approximately $120,000. Based upon this benefit, I calculated that I could pay off my student loan in four years of participation in the IHSLRP.

7. I began working as a psychologist at Maniilaq Association on July 1, 1999. Ms. Mendoza had explained that I was qualified for the year 1999 for loan repayment benefits, but that the funds had already been spent so that I did not expect to receive an award. However, I expected to receive the executed contract which I had signed in October of 1997 from the Department to memorialize the contract for my participation in the program beginning January 1, 2000. In mid August 1999 I was verbally informed by the Indian Health Services Alaska recruiter Ken Bartline that the award amount for the fiscal year 2000 was going to be reduced by the Indian Health Service to $20,000 per year plus 20% of federal taxes.

8. I contacted numerous persons at the Indian Health Service and the loan repayment program to point out to them that this unilateral change in the benefits was in violation of the form of contract that I had been asked to sign in October 1997 and in violation of the contract I had entered into in April 1999 with IHSLRP which induced me to move to Alaska. I was advised by IHSLRP Acting Chief Charles Yepa that, while my complaint was certainly understandable and that persons in my unique position had not been considered when the department decided to change its level of benefit, there was nothing that could be done.

9. I was presented in early 2000 with a form of written contract which was identical to the one I had signed in October of 1997 with the exception that the benefit was stated to be $20,000 per year plus the 20% tax payment. The loan repayment was the sole reason I had closed my practice, moved from California and taken up residence north of the Arctic Circle. Since I had already moved, I felt I had no bargaining power and no choice but to sign the form

of contract or forego any benefit at all while I disputed the matter with IHSLRP. I was advised that if I did not sign the contract without changes, I would be disqualified from the Program. I was sure that my multiple written and verbal communications to the IHS personnel prior to signing the document made it very clear that I considered there to be an existing agreement for $30,000 and a 31% loan repayment which had been unilaterally breached by the IHSLRP. The form of contract I signed under these circumstances obligated me for two years, which had been the standard initial term I agreed to with Ms. Mendoza. Again, I had every intention of exercising the option to renew my contract so that I would get loan repayment for four years to completely paydown my student loan debt.

10. Prior to my signing the form of contract, I had had legal counsel communicate with the Indian Health Service pointing out the agreement that had been breached and the inequities of the current situation. At my request counsel indicated that the matter could be resolved if my full benefit of $30,000 per year plus 31% were reinstated. While there was no written response to my attorney's letter, when the loan repayment benefits were issued in the year 2000, I received a $30,000 loan repayment benefit and later received notice that 31% of my additional income taxes had been paid. At that point I concluded that the IHSLRP had reaffirmed the fact that we did have an agreement for a benefit of this amount and considered the matter resolved.

11. Following the receipt of the benefit mentioned in the proceeding paragraph, I was advised by IHSLRP that they had made a mistake in paying me that amount of money and planned to deduct the "overpayment" from the following year's benefit. That in fact was done.

12. I signed a document on May 20, 2002 which was an extension of the previous two year contract and covered the year 2003. It provided for the $20,000 and 20% benefit. I signed this only because I was already in Alaska and had no bargaining power. I was continuing at that time to reiterate in writing to a number of Government officials my position that the original contract that brought me to Alaska had been breached. I also signed a document on May 19, 2003 that operated as a one year extension of my service through 2004. Again the benefit was $20,000 and 20% payment of taxes. I signed the contract for 2004 because I had no bargaining power and because my student loans were still not paid off. At the end of the four-year period, IHSLRP paid down $80,000 of my $120,000 student loan debt. Additionally, $16,000 was paid to the IRS by IHSLRP on my behalf. I paid the remaining $40,000 to pay off my student loan debt, and the additional $21,200 owed to the IRS by IHSLRP on my behalf.

13. If I had been advised prior to leaving California in 1999 that the benefit that I would receive if I accepted the position with Maniilaq was being reduced from $30,000 plus 31% for taxes to $20,000 plus 20% for taxes, I would not have left California and I would not have taken the position with Maniilaq Association.

Executed this __________ day of April, 2004 at Kotzebue, Alaska.

_______________________________
Bruce Ruttenburg

Executed this 27 day of April, 2004 at Kotzebue, Alaska.

Bruce Ruttenburg

Certificate of Service

I hereby certify that on April 28, 2004, a copy of the foregoing

1. **Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss Or, In The Alternative, For Summary Judgment**;

2. **Affidavit of Bruce Ruttenburg in Opposition to Motion to Dismiss Or, in the Alternative, for Summary Judgment** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

I further certify that on March 29, 2004, I caused to be served by United States mail copies of **Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss Or, In The Alternative, For Summary Judgment and Affidavit of Bruce Ruttenburg in Opposition to Motion to Dismiss Or, in the Alternative, for Summary Judgment** addressed as follows:

**Steven Mager**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**United States Department of Justice**
**Washington, D.C.**
**Telephone: (202) 616-2377**
**Facsimile: (202) 514-8624**

**Attn.: Classification Unit**
**1100 L Street, NW, 8th Floor**

s/James Geagan
James Geagan